**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WHITNEY SHUCKS,<br>PHILLIP HAMMONDS,<br>SHEILA SCHROERS, and<br>JASON WENDT,<br>on behalf of all other similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF UNIVERSITY CITY, MISSOURI,<br>and JENNIFER MCCLAIN,<br>RACHEL WHITE,<br>ALONZO MCDANIEL,<br>RICHARD WHITE, and<br>STEVE OLSEN, in their individual capacities.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.:<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

1. Plaintiffs and Class Members in this case are individuals whose cars were towed from private property at the direction of the City of University City for alleged violations of its municipal ordinances. University City violated the United States Constitution through warrantless searches of homes and seizures of vehicles. University City further violated the Constitution by failing to provide residents with notice or an adequate opportunity to be heard either before or after seizing their vehicles. The towed vehicles were parked on private property, generally on the owners' driveways, and neither interfered with public way nor represented a safety hazard requiring remediation without notice and opportunity to be heard. To retrieve their vehicles, Plaintiffs and Class Members had to pay a private towing company for both towing and storage fees. Many could not afford to retrieve their vehicles at all.

2. University City's unconstitutional conduct upends the already precarious existences of its most vulnerable residents by denying them dependable access to transportation. Indeed, University City almost exclusively targeted cars for towing because their owners could not afford the Missouri state sales tax that is a prerequisite to properly registering a vehicle, or because the owners had not yet updated the car's registration due to being unable to afford emissions or safety testing.

## Nature of the Action

3. It is and has been the policy, custom, and practice of the City of University City to direct its law and code enforcement officers to enter residents' private property—such as residential driveways, carports, and backyards—to examine parked vehicles for a potential ordinance violation without securing judicial or administrative warrants authorizing the searches.

4. It is and has been the policy, custom, and practice of the City of University City to direct its law and code enforcement officers to order that parked vehicles be towed from residents' private property—such as residential driveways, carports, and backyards—without securing judicial or administrative warrants authorizing the seizures.

5. It is and has been the policy, custom, and practice of the City of University City to order the towing of its residents' vehicles from private property for alleged ordinance violations without providing notice or adequate opportunity for owners to be heard before or promptly after the deprivation.

6. It is and has been the policy, custom, and practice of the City of University City to order the towing of its residents' vehicles from private property without a compelling state interest. Indeed, this towing usually exacerbates financial hardship, making it more difficult for individuals to properly title or register future vehicles.

7. It is and has been the custom and practice of University City Officers Jennifer McClain, Rachel White, Richard White, Alonzo McDaniel, and Steven Olsen to enter private residential property to search and seize vehicles without securing judicial or administrative warrants.

8. Plaintiffs seek declaratory and compensatory relief.

**Jurisdiction and Venue**

9. This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201, et seq., and the Fourth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

10. Venue in this District is proper pursuant to 28 U.S.C. § 1391 because the Defendants reside here, and the events giving rise to Plaintiffs' claims occurred in this District.

**Parties**

11. Plaintiff Whitney Shucks is a thirty-six-year-old woman and current resident of University City.

12. Plaintiff Sheila Schroers is a forty-six-year-old woman and former resident of University City, now residing in Jefferson County.

13. Plaintiff Jason Wendt is a fifty-year-old man and former resident of University City, now residing in Jefferson County.

14. Plaintiff Phillip Hammonds is a forty-two-year-old man and former resident of University City, now residing in St. Charles County.

15. Defendant City of University City ("University City" or the "City") is a municipal corporation organized under the laws of the State of Missouri and was at all relevant times acting under the color of law. Defendant University City operates the University City Police Department,

which includes its law and municipal code enforcement officers, the Mayor's Office, the City Council, the City Manager's Office, the City Clerk's Office, and all other governmental services in the municipality.

16. Defendant Jennifer McClain, sued in her individual capacity, is an officer for University City. At all times relevant to the complaint, Defendant McClain was acting under the color of law. She is responsible for enforcing University City's municipal ordinances.

17. Defendant Rachel White, sued in her individual capacity, is an officer for University City. At all times relevant to the complaint, Defendant Rachel White was acting under the color of law. She is responsible for enforcing University City's municipal ordinances.

18. Defendant Richard White, sued in his individual capacity, is an officer for University City. At all times relevant to the complaint, Defendant Richard White was acting under the color of law. He is responsible for enforcing University City's municipal ordinances.

19. Defendant Alonzo McDaniel, sued in his individual capacity, is an officer for University City. At all times relevant to the complaint, Defendant McDaniel was acting under the color of law. He is responsible for enforcing University City's municipal ordinances.

20. Defendant Steven Olsen, sued in his individual capacity, is an officer for University City. At all times relevant to the complaint, Defendant Olsen was acting under the color of law. He is responsible for enforcing University City's municipal ordinances.

## **Factual Overview**

### **The City's Unconstitutional Towing Scheme**

21. In three years alone, University City has directed the towing of over 150 parked vehicles from private residential properties—including from inside carports, behind privacy fences, in backyards, and in driveways—for allegedly violating a municipal ordinance.

22. University City and its officers commonly refer to such vehicles as "abandoned" or "derelict."

23. But the vehicles towed from private property were neither abandoned nor derelict.

24. Almost all of these vehicles were seized due to lack of proper licensing or expired license plates, and not due to any visible structural defect or safety hazard.

25. Parked on private residential property, these vehicles presented no emergent hazard or safety risk.

26. Many vehicles were parked while the owner worked to save money for the expensive process of renewing license plates, such as paying property taxes and conducting required safety and emissions testing.

27. This widespread towing scheme persists despite the City's own ordinances, which do not permit towing vehicles from private property under these circumstances.

28. Four City ordinances control when a vehicle may be towed from private property. Ordinance 385.030(A) provides, in relevant part, that

> [n]o person in charge or control of any property within the City, whether as owner, tenant, occupant, lessee, agent or otherwise, shall allow any vehicle without having thereon displayed a current State license plate or a historic motor vehicle license plate, as by law provided, or any abandoned vehicle or any vehicle in such a state of disrepair that it is unsightly or incapable of being moved under its own power to remain on such property longer than seven (7) days.

University City Municipal Code, Section 385.030.

29. Ordinance 385.030 is limited by Ordinance 385.100, which provides that the City may tow a vehicle from private property only where it is found to be "abandoned or inoperable." University City Municipal Code, Section 385.100.

30. Ordinance 385.110 adds another limitation: the City may only tow vehicles from private property that are "deemed a public health safety hazard" or are "harmful to the public health." University City Municipal Code, Section 385.110.

31. These Ordinances are further limited by Ordinance 385.050, which provides the disposition process. When a vehicle is "in such condition that it is no longer self-propelled," then the "Police are authorized to arrange for prompt removal on behalf of the City" if the "person in charge or control of the property" received "ten (10) days of . . . written notice." University City Municipal Code, Section 385.050.

32. Under the terms of its own ordinances, then, the City may only tow a vehicle if, at minimum, it has "remained" on a property for seven days, it is deemed "abandoned or inoperable," it is deemed "harmful to the public health" or a "public health safety hazard," it is no longer self-propelled, and the City provides ten days of written notice.

33. By their plain language, the ordinances do not allow for the towing of vehicles parked on private property simply because they have expired tags.

34. The so-called noticed system used by University City prior to all tows is completely inadequate.

35. Notice is so paltry that in at least one instance, the vehicle owner reported their vehicle as stolen to University City Police Department, when in fact that department had just hours before towed the vehicle without any warning.

36. Often, the City provides no notice whatsoever.

37. When the City attempts to supply so-called notice, it uses one of two methods.

38. The first is a form letter.

39. These letters are often not addressed to anyone, and instead remain blank in the tow file and are never mailed.

40. For those that are addressed and mailed, they are directed to the owners of the property. In instances of a tenant-occupied property, this means the letters are addressed to landlords who may have never occupied the residence or live out of town. It is common for the letter not to be delivered to the home where the vehicle owner resides.

41. The City sends these letters to no address or the wrong address despite knowing precisely who occupies each residence due to the City's intensive occupancy permitting process.

42. The form letter is divided into three sections.

43. In Section I, officers are directed to write the name and address of the recipient. As mentioned, this section is often blank because the letters are not mailed at all.

44. Section I instructs, "Vehicle is subject to removal five (5) days from the above date by the University City Police Department (even if moved to private property) for the following reason[,]" then includes a line where officers sometimes handwrite an alleged explanation for the tow—such as "failure to register"—and states the vehicle will be towed to Hartmann's Towing.

45. The five-day period conflicts with Ordinance 385.050, which sets a ten-day notice requirement.

46. Section II explains that a resident may only have their vehicle released from Hartmann's if the resident is able to obtain a release form from the City Police Department.

47. The size of the font is meaningfully reduced in Section III, which is titled "Procedure for Owner of Vehicle to Request Hearing."

48. Section III states, in full,

> Any person entitled to notice under these provisions is entitled to a hearing. The request shall be in writing and filed in the City Manager's Office no later than five

> (5) days after notice was provided. For further information, contact the City Manager at 862-6767. For vehicles subject to removal, a hearing may be requested prior to the vehicle being removed. The vehicle will be removed if a hearing is not requested in a timely manner.

49. The phone number provided is not the actual number for the City Manager, only the general number to City Hall.

50. The form letter does not advise recipients how to proceed when, as is often the case, the letter arrives in the mail within a day or two of the alleged tow date or after the tow has occurred. The letter does not mention that a hearing could be requested post-deprivation.

51. The form letter does not cite an ordinance that was allegedly violated such that its recipients could understand the alleged basis for the tow.

52. Even when residents do attempt to call the number provided or have a hearing, no hearing is in fact available.

53. Residents who call this number are not directed to the City Manager, but rather to the University City Police Department, the very entity threatening to tow the vehicle.

54. The Police Department, in turn, does not re-direct people to the City Manager, or inform residents of their right to challenge the tow. Instead, the officer at the Police Department, at most, instructs residents that the only way to stop the tow is to abide by (and pay costs pursuant to) the officer's personal opinion about why the vehicle should be towed. More commonly, the officer tells the caller there is nothing that can be done to stop the tow.

55. Despite the letter stating that "the vehicle will be removed if a hearing is not requested in a timely manner," the vehicles are removed even when a person calls or visits or otherwise attempts to timely request a hearing.

56. The second method of so-called notice is a sticker.

57. Officers place these stickers on people's vehicles, even when the vehicles are parked in private driveways, in carports, in backyards, and behind privacy fences.

58. The stickers contain a minimal amount of information.

59. The stickers do not provide what ordinance has allegedly been violated.

60. The stickers do not provide any information whatsoever about a hearing.

61. The stickers provide, at most, slim handwritten notes, such as "failure to register," or whatever the officer may write in the narrow blank line, as well as a telephone number for the University City Police Department's main line.




62. For residents who call this number, they are directed to the very officer who ordered the tow.

63. The officer does not advise the resident of their right to a hearing.

64. Whether "notice" is provided by letter or sticker, no hearings actually occur prior to University City towing vehicles from private property.

65. The hearings are so fictitious that University City does not even train its staff as to their purported existence. At least one resident went to City Hall, asked a clerk about scheduling a hearing, and the clerk, having never heard of such an option, directed the resident to speak with Animal Control.

66. University City municipal code does not prescribe any ordinance, rule, standard, process, or procedure for a pre- or post-tow deprivation hearing. *See* University City Municipal Code, Title III, Traffic Code.

67. In fact, there is no provision whatsoever in University City's Municipal Ordinances that prescribes any procedures for hearings related to vehicles which a police or code enforcement officer seeks to tow.

68. But even if the hearings do take place, the City does not provide notice to the car owner of its decision as to whether their vehicle was subject to tow under City ordinance and does not give them a specific time to abate the issue.

69. Because there are no issued findings or final decision, the vehicle owner has no ability to appeal the final decision or file a petition for judicial review.

70. As there are no hearings, no findings, no final decision, and no path to judicial review, there is no oversight from a neutral third party to determine that a flagged vehicle actually constitutes a towable offense either before or after it is towed.

71. But that is not the only oversight issue in University City's towing scheme.

72. University City policy, practice, and custom is that officers conduct searches to examine vehicles without first securing a warrant authorizing the search. Officers conduct these warrantless searches by entering and closely inspecting the curtilage of people's homes, including behind privacy fences, in backyards, in carports, and in private driveways.

73. University City policy, practice, and custom is that officers then return to and re-enter the curtilage without securing a warrant.

74. For Fourth Amendment purposes, the curtilage is entitled to the same degree of protection and privacy as the home itself.

75. It is therefore the policy, practice, and custom of University City for officers to enter and inspect residents' homes without a search warrant.

76. Also pursuant to University City police, practice, and custom, officers do not seek a warrant prior to towing residents' vehicles from private property.

77. It is therefore the policy, practice, and custom of University City to enter into residents' homes to effectuate warrantless seizure of vehicles.

78. City officers do not seek or receive consent before searching homes or seizing vehicles.

79. When residents have asked the agents to leave, they are threatened with arrest for allegedly interfering with the officers' duties.

80. No exigent circumstance or exception justifies dispensing the warrant requirement.

81. University City ordinances impose no affirmative requirement on an officer to obtain a warrant prior to searching a home or seizing a vehicle.

82. Through its ordinances and in practice, the City demands that residents submit to such warrantless searches and seizures. Ordinance 385.060, titled "Access to Property to Remove" provides that a vehicle owner "shall not deny access to [their] property by any duly authorized agent of the City for the purpose of examining or removing such vehicle." University City Municipal Code, Section 385.060.

83. The entire search and seizure process comprising University City's tow scheme is done without any judicial oversight. No warrants are ever issued by a neutral magistrate.

**Unconstitutional Tow of Plaintiff Whitney Shucks' Vehicle**

84. Whitney Shucks has owned and resided in a bungalow in University City's Third Ward for over eleven years, which she shares with her two minor children.

85. Ms. Shucks works full-time as an eighth-grade teacher. In her limited spare time, she picks up additional work as a painter.

86. Her home does not have a garage, but it has a semi-enclosed carport where Ms. Shucks parked her vehicle.

87. The carport is enclosed on three sides, two of which connect directly to Ms. Shucks' home.

88. A private door on the carport's interior wall opens directly into Ms. Shucks' home.

89. Ms. Shucks used the carport to park her vehicle and the private door to enter in and out of her house with her children.

90. Ms. Shucks has used the carport for storage of personal items such as a family bicycle.

91. Visitors to Ms. Shucks' house must walk up a separate path, on the other side of Ms. Shucks' property, to a short set of steps that lead to her front porch and door.

92. Around 2019, Ms. Shucks purchased a 2009 Dodge Journey. It was her family car, and she relied on it not only to get to her teaching and painting jobs, but also to drive her two young children to school, appointments, and activities.

93. She liked that the vehicle had three rows of seats—plenty of room for her family—and her children liked the built-in television screen on which they could watch shows.

94. The vehicle was clean, operable, and in good condition.

95. In 2024, when Ms. Shucks went to have her vehicle inspected to renew its tags, the inspector claimed to have found a small issue that could cause the car to overheat on long drives. The car did not immediately pass inspection, and Ms. Shucks' vehicle tags expired.

96. Because the vehicle was otherwise in excellent condition, Ms. Shucks began dedicating whatever time and money she could to fixing the issue. She even self-studied car repair through YouTube videos.

97. But because money was limited, she could not afford to get the vehicle inspected again to determine whether the issue was resolved.

98. While Ms. Shucks was saving money to have the vehicle inspected, she parked the vehicle inside the carport, where it was not easily or entirely visible from the street.

99. In or around October 2024, Ms. Shucks received a letter in the mail from University City that said the vehicle would be towed within days due to a "failure to register."

100. The letter did not cite any ordinance that Ms. Shucks allegedly violated.

101. This was the first that Ms. Shucks learned the City had an issue with her vehicle.

102. No officer had asked Ms. Shucks to enter her property to inspect her vehicle, and Ms. Shucks had not consented to a search of the same.

103. Nonetheless, because of where the vehicle was parked, in order for a University City officer, who on information and belief was Jennifer McClain, to have inspected the vehicle, she would have had to walk into Ms. Shucks' enclosed carport.

104. Officer McClain did not have a warrant to enter and search Ms. Shucks' property.

105. Officer McClain did not put a sticker on Ms. Shucks' car.

106. Because the City's form letter is so unclear, Ms. Shucks did not, upon reading the letter, discern any entitlement to a hearing or understand that she could challenge the tow.

107. And because Ms. Shucks knew she could not afford to have her license plates renewed within a short time frame, she did not believe there was anything she could do to stop the tow.

108. Ms. Shucks returned home on October 4, 2024, and found Officers McClain and Olsen at her house and in and near her carport.

109. Neither Officer McClain nor Officer Olsen had a warrant that authorized them to be on Ms. Shucks' property to inspect or search, nor did they have her permission.

110. At that point, no tow truck had arrived.

111. Ms. Shucks explained to Officer McClain that she was trying to fix the car so that it would pass inspection and pleaded with McClain to see if Ms. Shucks could do anything to stop the tow.

112. Officer McClain said nothing could stop the vehicle from being towed that day.

113. Officers McClain and Olsen called Hartmann's Towing Company and ordered it to tow Ms. Shucks' vehicle.

114. Ms. Shucks did not have the money on hand to immediately pay for the vehicle's release from Hartmann's. Once her next paycheck arrived, she promptly called Hartmann's, but was told that the release fees had surpassed $2,000 and were increasing by hundreds of dollars daily.

115. It was not financially possible for Ms. Shucks to pay such a steep fee.

116. Ms. Shucks never recovered her vehicle.

117. Ms. Shucks' vehicle contained important supplies: artwork she had created; work boots for her painting jobs; and miscellaneous items she stored in her car for safety and convenience.

118. Ms. Shucks asked Hartmann's if she could at least retrieve these items and was told she could only get them back if she paid for the vehicle's release.

119. Neither the letter, nor the Officers told Ms. Shucks what ordinance she allegedly violated.

120. The police report later completed by Officer Olsen contains absolutely no mention of any City ordinance that had been violated or any details that suggest an ordinance violation.

121. The officers did not have a warrant from a neutral magistrate at any point: not for entry into her property to inspect or search for vehicles; not to enter again to allow a tow truck on the premises; and not to seize her vehicle.

122. Neither the letter, Officer McClain, nor Officer Olsen told Ms. Shucks about the option for a pre- or post-deprivation hearing in front of a neutral party.

123. The City never sent Ms. Shucks post-deprivation notice about her right to be heard.

124. University City afforded Ms. Shucks no opportunity to be heard before or after seizing her vehicle.

125. University City did not conduct an adequate hearing regarding Ms. Shuck's vehicle prior to or after towing it. On information and belief, no such hearing was held.

126. Because there was no hearing at all, there was no adequate hearing in which a neutral third party deemed the car to be in violation of an ordinance and subject to tow.

127. Because there was no hearing and no findings, Ms. Shucks never received post-hearing findings that contained instructions for her to abate or otherwise cure the issue within a stipulated post-hearing period to retain her property.

128. And, because there was no hearing and no findings, Ms. Shucks had no opportunity to object, appeal, or otherwise challenge the determination to deprive her of her property.

129. Had Ms. Shucks known about the possibility of a pre- or post-deprivation hearing, she would have strenuously objected to the grounds for the tow, because the vehicle could propel, was not derelict, and the only thing preventing it from carrying up-to-date tags was prohibitive costs.

130. Ms. Shucks would have presented that the car, parked under the carport, was not blocking any public way, was not presenting any safety issue, and was not in any way a hazard to the public health. She would also have alerted City Officials that she was working as quickly as time and money allowed to bring her car into legal compliance, and that taking her car away and charging release fees would only stymie that progress.

131. Not only did the City officers fail to tell Ms. Shucks she was entitled to a hearing, Officer McClain's statement that nothing could be done to stop the tow affirmatively misled Ms. Shucks to believe that there was no path to challenge any part of the deprivation.

132. After the vehicle was towed, Ms. Shucks was frustrated, angry, and upset.

133. She had lost her family car, her painting supplies, and a dream she'd carried of gifting the car to her son when, in a few years, he turned sixteen.

134. Due to the seizure of her car, Ms. Shucks had difficulty commuting to work and an increased burden caring for her family.

135. Ms. Shucks experienced severe emotional distress, humiliation, insult, anxiety, sadness, and stress, prior to, during, and after the towing.

**Unconstitutional Tows of Plaintiffs Sheila Schroers' and Jason Wendt's Vehicles**

136. Sheila Schroers and Jason Wendt are long-time partners who moved into University City's Third Ward in 2021.

137. They shared a bungalow-style home with Ms. Schroers' young son, a minor.

138. When they moved into the home, Mr. Wendt secured an occupancy permit with the City.

139. A long, paved private driveway (Ms. Schroers and Mr. Wendt estimate it could fit at least six cars without interfering with the sidewalk) wrapped around the immediate border of the home, extending from the street, down the length of the house, and directly to a detached garage located in the backyard of the house.

140. A privacy fence bordered the backyard, and greenery planted along most of the fenceline created additional privacy between their yard and the neighbors' property.

141. In the backyard, the driveway abutted two private doors that led into Ms. Schroers' and Mr. Wendt's kitchen and basement.

142. Ms. Schroers and Mr. Wendt primarily relied on the private back doors to enter and exit their home.

143. Just along the rear driveway, Ms. Schroers and Mr. Wendt stored a picnic table and Ms. Schroers' son's toys: a plastic play tower and a playground set with a treehouse.

144. Completely separate from the driveway was a concrete path that led through the front yard from the sidewalk to the front door. Visitors used this path to approach the front door and enter the house.

145. Ms. Schroers and Mr. Wendt owned and parked four cars in their driveway.

146. In the portion of the driveway located in the backyard, Ms. Schroers parked a 2001 Toyota Camry and a 1998 Toyota 4Runner, both registered in her name.

147. Then, in the back half of the driveway along the privacy fence, was Ms. Schroers' 2008 Dodge Ram, her primary mode of transportation to her job as a fork-lift and bobcat driver and to take her son to school and activities.

148. Fourth in the driveway was Mr. Wendt's 2001 Dodge Ram, his primary method of transportation.

149. The tags on the Camry had expired, and Ms. Schroers was working toward getting a repair to the motor that was necessary for the vehicle to pass inspection. But the motor was expensive, and Ms. Schroers was saving money to make the repair. Otherwise, the Camry was in good condition.

150. The tags on the 4Runner had not expired, but, due to some damage to the front bumper, Ms. Schroers did not feel comfortable driving it until she could get it fixed. The repair to the bumper was cost prohibitive, and Ms. Schroers could not afford a repair immediately. Still, the damage was in only one spot, and the vehicle was otherwise in fine condition.

151. Mr. Wendt's Dodge Ram was in pristine condition, but the tags had recently expired, and the renewal process was moving slowly because Mr. Wendt was unable to obtain a necessary document which was in the possession of the truck's previous owner.

152. In March 2023, Ms. Schroers looked out her window and observed Officer Rachel White walking around her backyard, examining the Camry and 4Runner.

153. Ms. Schroers and Mr. Wendt had received no letter, sticker, or other form of notice that there were issues with their vehicles.

154. Officer Rachel White had asked neither Ms. Schroers or Mr. Wendt to enter their backyard nor had she received consent to search the same.

155. Officer Rachel White did not have a warrant authorizing her to enter and search the backyard.

156. Ms. Schroers exited the private back door and asked Officer Rachel White what she was doing in their backyard.

157. Officer Rachel White told Ms. Schroers they had to move the vehicles in the backyard but did not explain why.

158. Ms. Schroers did not understand and was confused about what to do. She did not have another place she could park her vehicles.

159. Officer Rachel White then told Ms. Schroers that the vehicles would be towed. She also told Ms. Schroers that she would not give her any sticker or paper notifying her of the tow, stating, "I'm not going to waste my stickers on these cars if the person is right here."

160. Based on Ms. Schroers' conversation with Officer Rachel White, Ms. Schroers understood that the City intended to tow the 4Runner and the Camry.

161. Ms. Schroers asked if it would stop the tow if she placed a tarp over her vehicles. Officer Rachel White responded that it would not.

162. Ms. Schroers asked if she could stop the tow by doing maintenance on her vehicles, and again Officer Rachel White said no.

163. Still confused, Ms. Schroers told Officer Rachel White that she did not believe the City had authority to tow her vehicles, to which Rachel White responded, "If you believe that, then I'll go get a warrant." Ms. Schroers implored her to go get a warrant, but Rachel White never did.

164. Officer Rachel White did not tell Ms. Schroers she was entitled to a pre- or post-deprivation hearing in front of a neutral decision maker.

165. Officer Rachel White handed Ms. Schroers only a card with Officer Rachel White's name and a phone number.

166. A few days after Officer Rachel White searched Ms. Schroers' backyard, Ms. Schroers called the number on the card, which connected her to Officer Rachel White's line at the City Police Department.

167. Over the phone, she asked Officer Rachel White if she could do anything to stop the tow.

168. Officer Rachel White told her she could have a few more days before the City towed the vehicles but did not provide any additional information.

169. On April 6, 2023, Officer Rachel White, with Officer McDaniel, returned to and entered Ms. Schroers' and Mr. Wendt's private backyard.

170. Neither Officer Rachel White nor Officer McDaniel had a warrant that authorized them to be on Ms. Schroers' and Mr. Wendt's property, nor did they have their permission.

171. The officers called Hartmann's and ordered it to tow vehicles from the residence.

172. Ms. Schroers was inside showering when she heard a loud noise.

173. She rushed outside and discovered Officer Rachel White once again standing in her driveway, this time with a Hartmann's Towing truck.

174. Ms. Schroers told the Officers that they did not have permission to tow the vehicles.

175. Officer Rachel White responded that she would arrest Ms. Schroers if she did anything to interfere with the towing.

176. Officer Rachel White ordered Hartmann's to tow Mr. Wendt's 2001 Dodge Ram.

177. This came as a surprise to Ms. Schroers, as neither she nor Mr. Wendt had any notice that the Dodge Ram was subject to tow.

178. Next, Officer Rachel White ordered Hartmann's Towing to move Ms. Schroers' 2008 Dodge Ram to reach the Camry and 4Runner behind it.

179. Only after Ms. Schroers pleaded that the City not touch the 2008 Dodge (a vehicle they didn't plan to tow) did Officer Rachel White allow Ms. Schroers to move the vehicle out of the way herself.

180. Officer Rachel White then ordered the tow of the remaining two vehicles in the backyard.

181. In sum, Officer Rachel White and Officer McDaniel ordered and effectuated the tow of three of Ms. Schroers' and Mr. Wendt's four vehicles.

182. Ms. Schroers' asked Officer Rachel White and Officer McDaniel how she could get their vehicles back without paying, and the officers responded that the only thing she could do was surrender her vehicles completely to the tow lot and give up any right of ownership.

183. Ms. Schroers called Hartmann's to ask about getting her Camry and 4Runner released, but she learned that the fines she would have to pay were prohibitively high.

184. Ms. Schroers' Camry contained tools she relied on for work as well as her son's toys, so she asked Hartmann's Towing if she could, at minimum, retrieve the items, but Hartmann's said the only way she could access that property was if she paid for storage and towing fees for her vehicles.

185. She lost both her vehicles and the property inside.

186. Mr. Wendt was able to afford the towing and storage fees, but it was at the expense of hundreds of dollars and had a significant financial impact on their family.

187. The police report later completed by Officer McDaniel contains absolutely no mention of any City ordinance that had been violated or any details that suggest an ordinance violation.

188. The officers did not have a warrant from a neutral magistrate at any point: not for entry into their property to inspect or search for vehicles; not to enter again to allow a tow truck on the premises; and not to seize the vehicles.

189. Neither Officer White nor Officer McDaniel told Ms. Schroers or Mr. Wendt about the option for a pre- or post-deprivation hearing in front of a neutral party.

190. The City never sent Ms. Schroers or Mr. Wendt post-deprivation notice about their right to be heard.

191. University City afforded Ms. Schroers and Mr. Wendt no opportunity to be heard before or after seizing their vehicles.

192. University City did not conduct an adequate hearing regarding Ms. Schroers' and Mr. Wendt's vehicles prior to or after towing. On information and belief, no such hearing was held.

193. Because there was no hearing at all, there was no adequate hearing in which a neutral third party deemed the vehicles to be in violation of an ordinance and subject to tow.

194. Because there was no hearing and no findings, Ms. Schroers and Mr. Wendt never received post-hearing findings that contained instructions for them to abate or otherwise cure the issues within a stipulated post-hearing period to retain their property.

195. Because there was no hearing and no findings, Ms. Schroers and Mr. Wendt had no opportunity to object, appeal, or otherwise challenge the determination to deprive them of their property.

196. Had Ms. Schroers or Mr. Wendt known they were entitled to a pre- or post-deprivation hearing, they would have strenuously opposed the seizures of the vehicles. They would have explained that they were working on getting the cars in compliance but were facing barriers—most financial and some logistical—that made immediate compliance impossible. They would have argued that their cars were safely stored in their private driveway and not presenting either health or safety risk.

197. Not only did the City officers fail to tell Ms. Schroers and Mr. Wendt they were entitled to a hearing, the Officers' statements that the only way to avoid payment was to completely surrender the vehicles affirmatively misled Ms. Schroers to believe that there was no path to challenge any part of the towing.

198. After the tow, Ms. Schroers and Mr. Wendt felt frustrated and embarrassed.

199. They loved living in University City. They enjoyed their quiet neighborhood and having numerous stores and restaurants in walking distance. But the code enforcement practices that resulted in the tows made them fearful that, at any time, the City could take additional adverse action against them.

200. Ultimately, Mr. Wendt and Ms. Schroers decided to leave University City. They still miss their neighborhood, but they suspect they cannot move back.

201. Mr. Wendt and Ms. Schroers experienced severe emotional distress, humiliation, insult, anxiety, sadness, and stress prior to, during, and after the towing.

**Unconstitutional Tows of Plaintiff Phillip Hammonds' Vehicles**

202. Mr. Hammonds purchased a home on Elmore Street in the City's Third Ward, in 2007.

203. Like other bungalow-style homes in University City, Mr. Hammonds' Elmore Street house had a long, paved private driveway.

204. He estimates five cars could comfortably park the driveway without blocking the sidewalk or road.

205. In front of the house, a small walking path splits off from the driveway, leading any visitors to Mr. Hammonds' house to his front porch and door.

206. But Mr. Hammonds' driveway extends well beyond that walking path, stretching immediately along the side of the house and wrapping behind the house, where the driveway was enclosed by a small backyard.

207. Mr. Hammonds used the backyard for daily activities of home life: cooking on his outdoor barbeque pit, relaxing, and storing supplies for lawn care.

208. Mr. Hammonds' backyard was enclosed on one side by a privacy fence. On the other sides, greenery and bushes planted along the property line created a privacy wall between his neighbors' property.

209. A private door led from the rear driveway into the back of Mr. Hammonds' house, directly into his kitchen. Mr. Hammonds primarily used this door to enter and exit his home.

210. The private backyard is also where Mr. Hammonds parked his 1987 Cutlass Supreme.

211. Mr. Hammonds purchased the vehicle in 2001 when he was in high school. Although he did not use it every day, he took great care of the vehicle because it held sentimental value, and he loved to drive it on special occasions.

212. The vehicle's tags had expired, but it was otherwise in good condition.

213. The vehicle's license plates were not visible from the public street.

214. In mid-November 2024, Mr. Hammonds noticed a sticker on his vehicle door.

215. Signed by Officer McClain, the sticker said the vehicle was subject to tow because it was derelict and not properly registered.

216. The sticker did not list an ordinance that the vehicle allegedly violated.

217. The vehicle was not derelict; it was in good, drivable condition.

218. Mr. Hammonds had not been asked by Officer McClain to enter his backyard or search his property, nor had he consented.

219. Officer McClain did not have a warrant authorizing her to enter and search Mr. Hammonds' backyard.

220. Based on the paltry information provided by the sticker, Mr. Hammonds could not have understood that he was entitled to a hearing to challenge the vehicle's seizure.

221. Mr. Hammonds did not receive any other mail or notice alerting him that the City planned to tow his vehicle.

222. On November 26, 2024, Mr. Hammonds received a call from a neighbor that City officers were in his backyard with Hartmann's, towing his vehicle.

223. Mr. Hammonds was not home at the time and had not known the City was planning on towing his vehicle that day.

224. Officers McClain and Richard White entered Mr. Hammonds' backyard and ordered Hartmann's to tow the vehicle.

225. Mr. Hammonds was able to release his vehicle from Hartmann's Towing Company, but it was at significant personal expense.

226. Neither Officer McClain nor Richard White had a warrant that authorized them to enter Mr. Hammonds' private backyard to inspect or search, nor did they have his permission.

227. Neither the sticker nor the Officers told Mr. Hammonds what ordinance he allegedly violated.

228. The police report later completed by Officer Richard White contains absolutely no mention of any City ordinance that had allegedly been violated or any details that suggest an ordinance violation.

229. The officers did not have a warrant from a neutral magistrate at any point: not for entry into his property to inspect or search for vehicles; not to enter again to allow a tow truck on the premises; and not to seize his vehicle.

230. Neither the sticker nor the Officers told Mr. Hammonds about the option for a pre- or post-deprivation hearing in front of a neutral party.

231. The City never sent Mr. Hammonds post-deprivation notice about his right to be heard.

232. University City afforded Mr. Hammonds no opportunity to be heard before or after seizing his vehicle.

233. University City did not conduct an adequate hearing regarding Mr. Hammonds' vehicle prior to or after towing it. On information and belief, no such hearing was held.

234. Because there was no hearing at all, there was no adequate hearing in which a neutral third party deemed the vehicle to be in violation of an ordinance and subject to tow.

235. Because there was no hearing and no findings, Mr. Hammonds never received post-hearing notice with findings that contained instructions for him to abate or otherwise cure the issue within a stipulated post-hearing period to retain his property.

236. And, because there was no hearing and no findings, Mr. Hammonds had no opportunity to object, appeal, or otherwise challenge the determination to deprive him of his property.

237. Had Mr. Hammonds known about the possibility of a pre- or post-deprivation hearing, he would have strenuously objected to the grounds for the tow, because the vehicle was operable, in good condition, and of particular sentimental value. He would have demonstrated that the vehicle had been kept in good condition for twenty years, was driven only on special occasions, and was not a hazard to public health or safety.

238. In addition to his property on Elmore, Mr. Hammonds also owned a residential property on Tulane Avenue, located North of Delmar in University City.

239. Visitors to the house would walk on a short path extending from the sidewalk to the front door.

240. Completely separate from that path was the driveway, which was adjacent to the house and wrapped around to a private backyard.

241. The backyard was enclosed by a fence and greenery, creating a sense of privacy between Mr. Hammonds' and his neighbors' backyards.

242. Mr. Hammonds parked a red 2005 Chevrolet Silverado pick-up truck behind his house, on a section of his driveway within the backyard.

243. Although the vehicle's license plate tags had expired, it was otherwise in good driving condition, and Mr. Hammonds used it as a primary means of transportation.

244. He also parked a trailer in the backyard, its tags current, which was used to store supplies for ongoing home improvement projects.

245. In or around October 2025, Mr. Hammonds was in the process of getting the tags updated, when he returned home to find his vehicle and trailer gone.

246. Mr. Hammonds received no warning whatsoever prior to the towing: the vehicle had not had a sticker on it, and Mr. Hammonds had not received a letter.

247. Mr. Hammonds never consented to any University City Officer, who on information and belief was Officer Jennifer McClain, entering or inspecting his backyard.

248. Officer McClain did not have a warrant authorizing her to enter and search Mr. Hammonds' backyard.

249. Officer McClain ordered Hartmann's to tow the vehicle and trailer.

250. Mr. Hammonds was able to release his vehicle and trailer from Hartmann's Towing Company, but it was at significant personal expense.

251. No letter, sticker, or officer told Mr. Hammonds what ordinance he allegedly violated.

252. Officer McClain did not have a warrant from a neutral magistrate at any point: not for entry into Mr. Hammonds' property to inspect or search for vehicles; not to enter again to allow a tow truck on the premises; and not to seize his vehicles.

253. No letter, sticker, or officer told Mr. Hammonds about the option for a pre- or post-deprivation hearing in front of a neutral party.

254. The City never sent Mr. Hammonds post-deprivation notice about his right to be heard.

255. University City afforded Mr. Hammonds no opportunity to be heard before or after seizing his vehicle and trailer.

256. University City did not conduct an adequate hearing regarding Mr. Hammonds' vehicle and trailer prior to or after towing. On information and belief, no such hearing was held.

257. Because there was no hearing at all, there was no adequate hearing in which a neutral third party deemed the vehicle and trailer to be in violation of an ordinance and subject to tow.

258. Because there was no hearing and no findings, Mr. Hammonds never received post-hearing findings that contained instructions for him to abate or otherwise cure the issue within a stipulated post-hearing period to retain his property.

259. And, because there was no hearing and no findings, Mr. Hammonds had no opportunity to object, appeal, or otherwise challenge the determination to deprive him of his property.

260. Had Mr. Hammonds known he was entitled to a pre- or post-deprivation hearing, he would have strenuously opposed the seizure of his vehicle and trailer. He would have argued that the vehicle and trailer were operable and in good condition and the only issue was that the tags had expired on the vehicle, which did not amount to a risk to public safety.

261. Mr. Hammonds experienced severe emotional distress, humiliation, insult, anxiety, sadness, and stress prior to, during, and after the towings.

**Officers' Unconstitutional Search and Seizure Practices**

262. University City officers Jennifer McClain, Rachel White, Richard White, Steve Olsen, and Alonzo McDaniel (collectively, the "Officers") are responsible for effectuating almost all the tows from private property in University City.

263. The Officers walk through carports, behind privacy fences, into backyards, and in private parts of driveways to search and to seize vehicles, without ever securing a warrant to do so.

264. In other words, the Officers conduct warrantless searches of areas in which residents have a reasonable expectation of privacy.

265. No exigent circumstances or other exception existed to dispense with the warrant requirement for these searches and seizures.

266. The Officers threatened to arrest residents who questioned the propriety of the Officers' actions.

267. The Officers searched and seized property knowing they did not have a warrant to do so.

268. The Officers knew or should have known that warrantless searches and seizures are unreasonable and in violation of the Fourth Amendment.

269. The City's final policymakers, including the City Manager, Mayor, City Council, and Chief of Police, have actual knowledge of this unlawful practice or, alternatively, are deliberately indifferent to its existence.

**Officials Having Final Policymaking Authority Were Deliberately Indifferent To and Tacitly Authorized Unlawful Towing Practices**

270. The issues with the towing scheme are well-known among City policymakers.

271. Nearly two years ago, multiple news sources published articles on the very towing scheme this lawsuit challenges. At the time, the news sources reached out to the City for comment, and the City defended and stood by its tow practices.

272. Around the same time, the City entered into, approved, and executed a pre-litigation settlement with a resident concerning a vehicle towed from a private driveway for expired plates without notice or a warrant.

273. City policymakers knew or should have known then of the issues with the towing scheme, and yet the City failed to change its practices.

274. But University City final policymakers had notice of the towing scheme well-before these news articles.

275. University City is a fourth-class city incorporated under Missouri law.

276. The Mayor and elected representatives from each Ward sit on the City Council, which has statutory management and control of the City and its finances.

277. The City Council appoints a City Manager, who serves as the chief executive officer for the City and is charged with administering the policies and practices adopted by the Council. University City Municipal Code, Section 111.050–.060.

278. Under City ordinance, the City Manager appoints and removes City Officers, prepares the budget for the City Council's adoption, and enforces all laws and ordinances. University City Municipal Code, Section 111.060.

279. The Chief of Police is the executive officer of the University City Police Department and is responsible for all units of the Police Department, including the Bureau of Field Operations and code enforcement officers.

280. The Mayor, City Council, City Manager, and Chief of Police have actual and constructive knowledge of the unconstitutional towing scheme.

281. The Mayor, City Council, and City Manager have knowledge of the scheme through reviewing and approving annual budgets which include anticipated and actual expenses

for tow-related code enforcement employees and anticipated revenue from citations arising out of ticketing vehicles after towing them.

282. Additionally, the Mayor, City Council, and City Manager have actual and constructive knowledge of the unconstitutional towing scheme given the minutes from monthly City Council Meetings, at which all policymakers are in attendance. From November 2020 onward, these minutes regularly include mention of the code enforcement practices around so-called derelict vehicles.

283. Additionally, in or around 2021, the City began a process of completely restructuring code enforcement practices to ensure that the Third Ward and area North of the Loop were subject to heightened code surveillance, which allowed for greater enforcement of the tow scheme. This restructuring was approved by the City Manager, Mayor, and City Council.

284. The restructuring required the Mayor and City Council to approve, and the City Manager to implement, processes to hire new employees, including new code enforcement officers, rezone patrol areas, acquire new vehicles, and purchase and implement new software to allow for more expansive code enforcement. The Chief of Police then had to onboard, train, supervise, and review the practices of these new officers.

285. Additionally, informally and at monthly City Council meetings, the Mayor, City Council, City Manager, and Chief of Police received, reviewed, and discussed detailed information about the process for towing so-called derelict vehicles from private property.

286. The Mayor, City Council, City Manager, and Chief of Police have discussed that the City's towing practice requires issuing a notice of violation, waiting for a "reasonable time" to pass, and then allowing the police to "use its governmental power" to tow a vehicle.

287. They have likewise discussed that code enforcement officers are given unbridled discretion to tow vehicles without any oversight or constraints from a hearing, judicial or administrative warrant, neutral magistrate, or hallmark of reasonableness under the Fourth Amendment.

288. The Mayor has actual and constructive knowledge of the unconstitutional practices through his managerial role in the municipal government, his supervision of and interactions with the Police Chief and City Manager, his exposure to various media outlets, and his obligation to preside over the City Council which has created, staffed, and overseen the creation of a code enforcement team over the last several years.

289. The City Council has actual and constructive knowledge of the unconstitutional practices through their role in assigning duties to offices, staffing and budgeting for new code enforcement roles, overseeing the municipal governmental structure, and discussing and ratifying the towing process for allegedly derelict vehicles.

290. Additionally, the City Manager has actual and constructive knowledge of the unconstitutional towing scheme given the position is allegedly tasked with scheduling and overseeing hearings to determine whether the vehicles at issue are deemed subject to tow, and yet, these required hearings do not happen. Moreover, the City Manager has publicly acknowledged the existence of the City's towing scheme on numerous occasions, including its lack of any oversight from a neutral party.

291. Additionally, the Chief of Police has actual and constructive knowledge of the unconstitutional towing scheme given his oversight and supervision of field agents charged with effectuating towings, calling Hartmann’s Towing Company, and completing tow reports. The Chief is also charged with reviewing police reports describing the illegal tow scheme. Because he

is responsible for training and supervising officers, Chief Hampton has actual notice that officers do not obtain warrants before entering, searching, and seizing property from residents' homes.

292. It would be unbelievable for University City's Mayor, City Council, City Manager, and Chief of Police to claim they did not have at least constructive knowledge of the towing scheme in University City given the information they receive, review, discuss, and approve regarding City functions and departments.

293. The Mayor, City Council, City Manager, and Chief of Police have taken no steps to ameliorate or alter the unconstitutional towing scheme despite their actual and constructive knowledge of the towings and the deficient processes. Indeed, they have ratified and approved the conduct of their agents. Alternatively, they have tacitly sanctioned them through inaction.

294. The Mayor, City Council, City Manager, and/or the Chief of Police have final policymaking authority for the City.

295. University City's Mayor is an official who has final policymaking authority for the City. Under City Charter, he is the presiding officer over the City Council, as well as a member of the City Council. University City Charter, art. II, secs. 5, 8. By delegation from the City Council, custom, and usage, the Mayor has final policymaking authority in that his decision to direct or ratify the actions of University City officers described in this complaint is unilateral, unreviewable, and free of constraints.

296. Alternatively, the City Council also has final policy making authority. Under City Charter, the Council is responsible for adopting ordinances, enforcing ordinances, and maintaining the safety, peace, and health of the City. University City Charter, art. II, sec. 17. The Council, on the recommendation of the City Manager, can also assign functions and duties to officers, departments, or agencies. *Id.* art. II, sec. 13.

297. Alternatively, the City Manager also has final policy making authority. Under the City Charter, the City Manager is the "chief administrative officer" for University City and maintains responsibility for "all the City's affairs" including enforcement of all ordinances. University City Charter, art. III, secs. 18, 19.

298. The City Manager has unilateral, unreviewable power to supervise the actions of City officers, create job positions, pass related budgets to scale the towing program, and permit towings when the Manager knew or should have known that they had made no hearing determinations about whether the vehicle should have been towed.

299. The Chief of Police has unilateral, unreviewable power to supervise the actions of his officers. In that regard, he is also an official who acts with final policymaking authority with actual knowledge of illegal towing practices through his oversight and approval of tow officers and related reports, as well as his managerial role in the University City Police Department.

## Class Allegations

300. The named Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(b)(1) and/or 23(b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of a class of persons defined as:

> **Proposed Class**: All persons whose vehicles were seized from private property, from October 22, 2021 to present, at the direction of University City due to an alleged violation of a municipal ordinance.

301. Under Rule 23(a), certification of a class is appropriate where: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

302. This action is brought and may properly be maintained as a class action pursuant to Rule 23(b)(1) and/or Rule 23(b)(3). This action satisfies the requirements of numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a).

**Rule 23(a)**

**Typicality**

303. Plaintiffs Shucks, Schroers, Wendt, and Hammonds are typical members of the proposed Class.

304. The named Plaintiffs and Class Members each have a tangible and legally protectable interest at stake in this action.

305. The claims of the named class representatives and the absent Class Members have a common origin and share a common basis. Their claims originate from the same illegal, unconstitutional practices of University City and its officers. Indeed, Plaintiffs and nearly all unnamed class members were deprived of their means of transportation because their vehicles were allegedly unlicensed or lacked proper plates.

306. The proposed class representatives state claims for which relief can be granted that are typical of the absent Class Members. If brought and prosecuted individually, the claims of each Class Member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

307. The claims and remedial theories pursued by the named class representatives are sufficiently aligned with the interests of absent Class Members to ensure that the universal claims of the Class will be prosecuted with diligence and care by the Plaintiffs as representatives of the class.

**Numerosity**

308. The members of the Class are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the Class consists of at least 150 persons, not all of whom continue to reside in University City. The Class is ascertainable because Defendants have identifying information for each Class Member including, but not limited to, the unique identifiers of each vehicle seized.

**Commonality**

309. The questions of law and fact common to the class include, *inter alia*:

a. Whether University City failed to adequately notify Plaintiffs and Class Members of any pre-seizure hearing.

b. Whether University City's failure to adequately notify Plaintiffs and Class Members of any pre-seizure hearing resulted in a seizure of their vehicles without any pre-deprivation opportunity to be heard.

c. Whether University City failed to conduct meaningful or adequate pre-deprivation hearings.

d. Whether University City's failure to conduct meaningful or adequate pre-deprivation hearings resulted in a seizure of Plaintiffs' and Class Members' vehicles without any pre-deprivation opportunity to be heard.

e. Whether University City failed to provide Plaintiffs and Class Members with any prompt post-deprivation hearing.

f. Whether the failure to provide Plaintiffs and Class Members with any prompt post-deprivation hearing resulted in a seizure of Plaintiffs' and Class Members' vehicles without any prompt post-deprivation opportunity to be heard.

g. Whether University City failed to conduct meaningful or adequate post-deprivation hearings.

h. Whether University City failed to provide Plaintiffs and Class Members with notice that their vehicles had been deemed in violation of municipal code and would be towed from private property.

i. Whether University City deprived Plaintiffs and Class Members of their vehicles without due process.

j. Whether University City's failure to require warrants resulted in unreasonable searches of residents' homes.

k. Whether University City's failure to require warrants resulted in unreasonable seizures of vehicles.

l. Whether University City had a compelling state interest to seize vehicles parked on private driveways simply for having expired tags.

**Adequate Representation**

310. The named Plaintiffs are willing and prepared to serve the Court and proposed Class in a representative capacity with all obligations and duties necessary. The Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to, or which directly or irrevocably conflict with, the interests of the Class. The self-interests of the named class representatives are coextensive with, and not antagonistic to, those of the absent Class Members. The proposed representatives will undertake to protect the interests of the absent Class Members.

311. The named Plaintiffs have engaged the services of attorneys from ArchCity Defenders, a firm with experience litigating complex civil rights matters in federal court.

312. Said counsel is experienced in complex class litigation, will adequately prosecute this action, and will capably represent the named class representatives and absent Class Members.

**Rule 23(b)(1)**

313. The prosecution of separate actions by individual members of the Class would create a risk of adjudication with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

314. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications among individual members of the Class that would establish incompatible standards of conduct for the parties opposing the Class.

**Rule 23(b)(3)**

315. The questions of law and fact common to members of the Class predominate over any questions affecting only individual members and can be resolved with common evidence.

316. A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

a. Individual claims by Class Members are impractical as the costs of pursuit far exceed what any one Plaintiff or Class Member has at stake;

b. There has been no other litigation over the controversies herein and individual members of the Class have no interest in prosecuting and controlling separate actions; and

c. The proposed Class is manageable.

**CLAIMS FOR RELIEF**

**COUNT I**

**Fourteenth Amendment, 42 U.S.C. § 1983—Deprivation of Property Without Due Process (Whitney Shucks, Sheila Schroers, Jason Wendt, and Phillip Hammonds, Individually and as Class Representatives, against University City)**

317. Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as set forth fully herein.

318. University City and its employees, agents, and representatives were, at all times relevant, acting under the color of law.

319. When a person is deprived of protected property interests, due process requires notice and that a hearing be provided before an impartial decision maker at a meaningful time and in a meaningful manner.

320. Generally, due process requires that a person be afforded an opportunity to be heard prior to the seizure of their property.

321. No exigent or emergent circumstances or necessitated the towing of vehicles parked on private property without a pre-deprivation hearing. A pre-deprivation hearing was neither impossible nor impracticable.

322. Where a pre-deprivation hearing is not possible or is otherwise impracticable, due process requires a prompt post-deprivation hearing.

323. Where the seizure of a vehicle is concerned, courts have found even a delay of more than seven days between the deprivation and the hearing is clearly excessive.

324. Plaintiffs and Class Members had protected property interests in their vehicles parked on private property.

325. University City deprived them of their protected property interests when it directed the towing of their vehicles.

326. In violation of the Constitution, University City offered Plaintiffs and Class Members no opportunity to be heard before or after taking their vehicles.

327. The minimal correspondence a person may receive from University City prior to a towing is inadequate. Even if car owners receive the tow notice letter, the City failed to notify Plaintiffs and Class Members of any pre-deprivation hearing because the letters provide minimal contact information—only a phone number that directs callers to City Hall, which in turn directs callers to the City Police Department.

328. Furthermore, the letters do not include any indication that Plaintiffs or Class Members would be permitted to be heard or offer evidence at the informational hearing.

329. When the City provides a sticker prior to a towing, there is no reference whatsoever to a hearing. When the recipient calls the number on the sticker, it leads to the Police Department, which does not inform the caller of their right to a hearing pre- or post-seizure.

330. University City regularly does not conduct the hearing referenced in the form letter either pre- or post-deprivation. The City has failed to establish any other procedure that would guarantee a meaningful hearing.

331. Nor does University City give notice of any purported hearing outcome, leaving Plaintiffs and Class Members unaware that their vehicles were officially deemed in violation of municipal ordinance prior to being towed.

332. University City provided no post-deprivation hearing to Plaintiffs or Class Members, let alone a prompt post-deprivation hearing.

333. University City officers caused the towing of vehicles without pre- or post-deprivation hearings pursuant to an official policy.

334. University City's official policymakers directed the towing of vehicles without pre- or post-deprivation hearings.

335. Alternatively, University City's official policymakers knew of and sanctioned this unconstitutional custom or practice.

336. University City's official policymakers took no steps to ameliorate this continuing, widespread, and persistent pattern of unconstitutional conduct of which they were on notice.

337. University City's official policymakers were deliberately indifferent to and tacitly authorized this pervasive custom of unconstitutional conduct.

338. The policies, practices and customs described herein were the moving force behind and the proximate cause of Plaintiffs and Class Members being subjected to violations of their constitutional right to due process.

339. As a result of the policies, practices and customs described herein, Plaintiffs and the Class suffered actual damages.

340. If Plaintiffs and the Class succeed in this Count I, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 *et seq.*

## COUNT II

**Fourth Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983 — Unreasonable, Warrantless Seizure of Property (Whitney Shucks, Sheila Schroers, Jason Wendt, and Phillip Hammonds, Individually and as Class Representatives, against University City, Jennifer McClain, Rachel White, Richard White, Alonzo McDaniel, and Steve Olsen)**

341. Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as set forth fully herein.

342. As incorporated through the Fourteenth Amendment, the Fourth Amendment guarantees individuals' rights to be free from unreasonable seizures.

343. The Fourth Amendment requires that, absent a well-established exception, a warrant must issue from an impartial magistrate.

344. Warrantless seizures conducted on private premises in the absence of exigent circumstances violate the Fourth Amendment.

345. University City and the Defendant Officers seized Plaintiffs' and Class Members' property when they towed their vehicles from private property.

346. University City and the Defendant Officers conducted these seizures without any warrant.

347. No exigent circumstances or other exception justified dispensing of the warrant requirement.

348. Even had the Defendants sought warrants, the applications would not have provided sufficient evidence that Plaintiffs' and Class Members' vehicles could be legally seized.

349. Separately, seizures conducted without any meaningful constraints on the seizing officers' discretion are always unreasonable.

350. Defendants' policy and practice of warrantless seizures place no meaningful constraints on the seizing officers' discretion, and that was true when Defendants seized Plaintiffs' and Class Members' vehicles.

351. Defendants seized the vehicles without considering: whether the towing comported with City Ordinances; whether the City had failed to conduct a meaningful hearing in each case; whether the City failed to notify the vehicle owners of the outcome of any hearing; and whether the City failed to notify vehicle owners of any post-hearing timeframe in which they needed to remediate the issue if they did not wish for University City to seize their vehicle.

352. These warrantless seizures were conducted pursuant to an official policy, custom, or practice of University City.

353. The University City municipal code makes no requirement that a warrant be secured prior to seizing a vehicle.

354. City ordinance affirmatively requires residents to provide officers with access to their private property and vehicles in order to allow the officers to conduct warrantless seizures.

355. This policy resulted in the unreasonable seizure of Plaintiffs' and Class Members' vehicles.

356. This policy is unconstitutional.

357. Alternatively, the towing scheme represents a custom or practice.

358. University City official policymakers knew of and sanctioned these unconstitutional customs or practices.

359. University City official policymakers directed the warrantless seizures of vehicles.

360. University City official policymakers took no steps to ameliorate this continuing, widespread, and persistent pattern of unconstitutional conduct of which they were on notice.

361. University City official policymakers were deliberately indifferent to and tacitly authorized this pervasive custom of unconstitutional conduct.

362. University City deliberately or consciously failed to train its officers to secure warrants prior to seizing private property.

363. University City deliberately or consciously failed to supervise its officers to ensure they secured warrants prior to seizing private property.

364. City officers face little or no discipline or job consequences for seizing vehicles without warrants.

365. The failures to supervise and train reflect a deficiency in University City's training and supervising procedures over officers charged with identifying allegedly towable vehicles and effectuating tows of the same.

366. The actions, policies, practices and customs described herein were the moving force behind and the proximate cause of Plaintiffs and the Class being subjected to violations of their constitutional right to be free from unreasonable seizures.

367. As a result of the actions, policies, practices and customs described herein, Plaintiffs and Class Members suffered actual damages.

368. The Defendant Officers' conduct described above was done with evil motive or intent, or was done with reckless or callous indifference to the constitutional rights of Plaintiffs and Class Members, such that punitive damages should be awarded to Plaintiffs and Class Members and against Defendant Officers, individually, to deter Defendant Officers and other similarly situated government officials from engaging in this unconstitutional misconduct in the future.

369. Defendants knew or should have known that their actions would result in the violation of Plaintiffs' and Class Members' constitutional rights.

370. If Plaintiffs and Class Members succeed in this Count II, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 *et seq.*

## COUNT III

**Fourth Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983—Warrantless Searches (Whitney Shucks, Sheila Schroers, Jason Wendt, and Phillip Hammonds, Individually and as Class Representatives, against University City, Jennifer McClain, Rachel White, Richard White, Alonzo McDaniel, and Steve Olsen)**

371. Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as set forth fully herein.

372. The Fourth Amendment forbids unreasonable searches of private property.

373. "[T]he area 'immediately surrounding and associated with the home'—what . . . cases call the curtilage—[is regarded] as 'part of the home itself for Fourth Amendment purposes.'" *Florida v. Jardines*, 491 U.S. 1, 6 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

374. Warrantless searches of the home are always unreasonable unless a historically recognized exception to the warrant requirement applies.

375. University City and the Defendant Officers searched Plaintiffs' and Class Members' homes when officers entered the curtilage to inspect and search vehicles.

376. University City and the Defendant Officers conducted these searches without any warrant and absent any exigent circumstances or other exception that justified dispensing the warrant requirement.

377. These warrantless searches of Plaintiffs' and Class Members' homes were unreasonable.

378. Separately, searches conducted without any meaningful constraints on the seizing officers' discretion are always unreasonable.

379. Defendants' policy and practice of warrantless searches places no meaningful constraints on the searching officers' discretion, and that was true when Defendants searched Plaintiffs' and Class Members' homes.

380. Additionally, searches conducted without probable cause are always unreasonable.

381. Prior to conducting the warrantless searches, Defendants had no cause to believe a violation took place.

382. These warrantless searches were conducted pursuant to official City policy.

383. University City municipal code makes no requirement that Defendants secure a warrant before searching property. The code further prohibits residents from denying City officials access to their homes to conduct such searches.

384. This policy resulted in the unconstitutional search of Plaintiffs' and Class Members' homes.

385. Alternatively, the warrantless search scheme is a City custom or practice.

386. University City official policymakers knew of and sanctioned these unconstitutional customs.

387. University City official policymakers directed the warrantless searches of homes.

388. University City official policymakers took no steps to ameliorate this continuing, widespread, and persistent pattern of unconstitutional conduct of which they were on notice.

389. University City official policymakers were deliberately indifferent to and tacitly authorized this pervasive custom of unconstitutional conduct.

390. University City deliberately or consciously failed to train its officers to secure warrants prior to conducting searches of homes.

391. University City deliberately or consciously failed to supervise its officers to ensure they secured warrants prior to conducting searches of homes.

392. City officers face little or no discipline or job consequences for searching homes without a warrant and without probable cause.

393. The failures to supervise and train reflect a deficiency in University City's training and supervising procedures over officers charged with identifying vehicles subject to tow under City ordinance.

394. Defendants knew or should have known that their actions would result in the violation of Plaintiffs' and Class Members' constitutional rights.

395. The actions, policies, practices and customs described herein were the moving force behind and the proximate cause of Plaintiffs and Class Members being subjected to violations of their constitutional right to be free from unreasonable searches.

396. As a result of the policies, practices and customs described herein, Plaintiffs and Class Members suffered actual damages.

397. Defendant Officers' conduct described above was done with evil motive or intent, or was done with reckless or callous indifference to the constitutional rights of Plaintiffs and Class Members, such that punitive damages should be awarded to Plaintiffs and Class Members and against Defendant Officers, individually, to deter Defendant Officers and other similarly situated government officials from engaging in this unconstitutional misconduct in the future.

398. If Plaintiffs and Class Members succeed in this Count III, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 *et seq.*

**COUNT IV**
**Fourteenth Amendment and 42 U.S.C. § 1983—Substantive Due Process Deprivation of Vehicles (Whitney Shucks, Sheila Schroers, Jason Wendt, and Phillip Hammonds, Individually and as Class Representatives, against University City)**

399. Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as set forth fully herein.

400. The Fourteenth Amendment shields persons from arbitrary and truly irrational governmental actions that deprive them of constitutionally protected property interests.

401. Plaintiffs and Class Members had constitutionally protected property interests in their vehicles.

402. In violation of substantive protections afforded by the Fourteenth Amendment, University City engaged in an arbitrary and truly irrational practice of seizing Plaintiffs' and Class Members' vehicles from private property despite the total absence of either safety or aesthetic concerns.

403. Parked on private property, the vehicles in question did not constitute hazards to public health or safety.

404. Rather, the vehicles were towed because they were not properly registered or lacked current license plates.

405. This policy, custom, and practice places University City residents who cannot afford to renew their vehicles' plates under perpetual risk that the City will tow the vehicle.

406. In so doing, University City's towing scheme penalizes its citizens for simply possessing unregistered cars on private property.

407. This policy, custom and practice of University City's towing scheme ignores the obvious and accepted method of enforcing a requirement that *drivers* be in fully registered cars: issuing municipal traffic tickets *when the car is driven or parked on City streets* rather than towing cars which are parked on private property.[1]

408. This policy, custom and practice of University City's towing scheme does not serve to ameliorate the issue which it purportedly addresses given that the cars are towed and then released once an individual has enough money to pay the impound fee; when University City tows a car for lack of proper registration, it does not subsequently ensure that the car is fully registered

[1] Indeed, the relevant University City Code provision states that "No motor vehicle or trailer shall be **operated on any highway of this City** unless it shall have displayed thereon the current and valid license plate or set of license plates issued for that motor vehicle or trailer by the State Director or Revenue and authorized by Section 301.140, RSMo." University City Municipal Code, Section 380.0130 (emphasis added).

prior to its release. This means the individual who owns the vehicle simply must pay money to receive a vehicle back in the exact same state of registration as when it was towed.

409. Indeed, by towing functional, unregistered cars, University City renders it even more difficult for low-income persons to save the funds necessary to properly register their vehicles.

410. Even if Section 385.030 could be applied to find that otherwise sound vehicles with expired tags could be ticketed as “abandoned” or “derelict,” Section 385.110 clearly delineates limits on vehicles on what vehicles may be seized.

411. Lacking a clear basis even in the text of its own ordinances, University City’s towing scheme shocks the conscience because it targets persons who are already struggling to amass the funds necessary to register their vehicles.

412. The towing program, as practiced against Plaintiffs and Class Members, is truly arbitrary and irrational because it targets well-maintained, physically operable vehicles that cannot be deemed "abandoned” or “derelict” or “hazardous” by any rational metric.

413. University City’s towing scheme is truly arbitrary and irrational because, rather than promoting the proper registration of vehicles, it makes it more difficult for low-income persons to register their cars by imposing additional costs and creating barriers to remunerative employment.

414. University City caused the towing of Plaintiffs and Class Members’ vehicles pursuant to an official policy.

415. Alternatively, University City’s official policymakers directed the towing of Plaintiffs’ and Class Members’ vehicles.

416. Alternatively, University City's official policymakers knew of and sanctioned these unconstitutional customs and practices.

417. University City's official policymakers took no steps to ameliorate this continuing, widespread, and persistent pattern of unconstitutional conduct of which they were on notice.

418. University City's official policymakers were deliberately indifferent to and tacitly authorized this pervasive custom of unconstitutional conduct.

419. The policies, practices and customs described herein were the moving force behind and the proximate cause of Plaintiffs and Class Members being subjected to arbitrary and truly irrational governmental actions that deprive them of constitutionally protected property interests.

420. As a result of the policies, practices and customs described herein, Plaintiffs and Class Members suffered actual damages.

421. If Plaintiffs and Class Members succeed in this Count IV, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, having stated the foregoing allegations and claims, Plaintiffs pray that this Court:

A. Certify the Class as requested herein;

B. Appoint Plaintiffs' counsel as lead counsel for the Class;

C. Appoint Plaintiffs Whitney Shucks, Sheila Schorers, Jason Wendt, and Philip Hammonds as representatives of the Class;

D. Enter a declaratory judgment that Defendant City of University City's conduct has violated Plaintiffs' and Class Members' Fourteenth and Fourth Amendment rights;

E. Enter a declaratory judgment that Defendant Officers' conduct has violated Plaintiffs' and Class Members' Fourteenth and Fourth Amendment rights;

F. Enter a judgment compensating the Plaintiffs and others similarly situated for the damages they suffered as a result of Defendants' unconstitutional and unlawful conduct;

G. Impose punitive damages against the Officers in their individual capacities;

H. Award pre-judgment and post-judgment interest;

I. Issue an order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

J. Any other relief this Court deems just and proper.

**DEMAND FOR JURY**

Plaintiffs and the proposed Class respectfully demand a jury trial on all issues so triable.

Dated: October 22, 2026

Respectfully submitted,

ARCHCITY DEFENDERS, INC.

/s/ Brianna Coppersmith
Brianna Coppersmith, MBE #75515MO
Maureen Hanlon, MBE #70990MO
5939 Goodfellow Blvd.
Saint Louis, MO 63147
314-891-5663
314-925-1307 (fax)
bcoppersmith@archcitydefenders.org
mhanlon@archcitydefenders.org